BUCHALTER
A Professional Corporation
BRIAN C.P. ADKINS (SBN 257181)
CHARLES F. WHITMAN (SBN 299779)
655 West Broadway, Suite 1600
San Diego, CA  92101
Telephone: 619.219.5335
Email:  cwhitman@buchalter.com
        badkins@buchalter.com

Attorneys for Plaintiff
REZA TIRGARI

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REZA TIRGARI, an individual, | CASE NO. '22 CV 541  CAB DEB |
| Plaintiff, | |
| vs. | COMPLAINT |
| REZA KAZEMIPOUR, an individual; 1792 PARTNERS INC., a Delaware corporation; 1792 PARTNERS GENERAL PARTNERSHIP; and DOES 1-100; | DEMAND FOR JURY TRIAL |
| Defendant. | |

Plaintiff REZA TIRGARI ("Tirgari" or "Plaintiff") alleges against Defendants REZA KAZEMIPOUR ("Defendant Kazemipour"), 1792 PARTNERS, INC. ("Defendant 1792"), and 1792 PARTNERS, INC. GENERAL PARTNERSHIP ("Defendant 1792GP") (Defendant Kazemipour, Defendant 1792 and Defendant 1792GP are collectively referred herein as the "Defendants") as follows:

## PARTIES

1.     At all times mentioned herein, Plaintiff was, and is, an individual over eighteen years of age and residing in San Diego County, California.

2.     Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendant Kazemipour was, and is, an individual over eighteen years of age and doing business in San Diego County, California.

3.     Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendant 1792 is a California corporation conducting business in San Diego County, California.

4.     Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendant 1792GP is a Delaware limited partnership purportedly formed via a Limited Partnership Agreement between Plaintiff, Defendant Kazemipour, and Defendant 1792, and conducting business in Santa Clara County, California.

5.     Plaintiff is informed and believes, and based thereon alleges, that there exists, and at all times herein mentioned there existed, a unity of interest and ownership between Defendant Kazemipour and the Defendants such that any individuality and separateness between Defendant Kazemipour and the Defendants have ceased. Defendant Kazemipour is the alter ego of Defendants.

6.     Plaintiff is informed and believes, and based thereon alleges, as an example, Defendant Kazemipour has used funds intended for Defendant 1792GP's purpose of investment into startup companies to instead pay for personal goods and services such as lavish personal travel and accommodations in Dubai, Abu Dhabi, Monaco, Nice, Amsterdam, Las Vegas, Mexico, and the Maldives, among other locations. Defendant Kazemipour has consistently utilized funds provided by Plaintiff, intended for investment into startup companies as induced by Defendant Kazemipour, for Defendant Kazemipour's own personal gain.

7.     By Defendant Kazemipour using Defendant 1792GP's funds in this manner, the corporate formalities of Defendant 1792 and Defendant 1792GP have been disregarded such that there exists a unity of interest and ownership between Defendant Kazemipour, Defendant 1792 and Defendant 1792GP, and no separation

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

between Defendant Kazemipour and Defendant 1792 and Defendant 1792GP actually exists.

8.     The true names and capacities, whether individual, corporate, associate or otherwise, of DOES 1 through 100, inclusive, are unknown to Plaintiff, who therefore sues these defendants by their fictitious names. Plaintiff is informed and believes, and based upon this information and belief alleges, that each of the fictitiously named defendants is in some manner responsible for the events and happenings herein referred to, either contractually or tortuously, and caused the damage to Plaintiff as herein alleged. Plaintiff will amend this Complaint to allege the true names and capacities of each of the fictitiously named defendants when ascertained.

## JURISDICTION AND VENUE

9.     There is federal question jurisdiction in this case arising under 28 U.S.C. § 1331 because as set forth in this Complaint Plaintiff has plead claims arising under federal statutes. *See* 18 U.S.C. §§ 1341, 1343, 1961, 1962, 1964.

10.    Under 28 U.S.C. § 1391 venue is proper because a substantial part of the events and omissions giving rise to the claims occurred within the judicial boundaries of this district and the contract which is the subject of this action was executed and performed within the judicial boundaries of this district.

## GENERAL ALLEGATIONS

11.    Defendant Kazemipour holds himself out on the internet as a "seasoned Senior Executive" with a "deep understanding and experience working on business strategies ranging from startups to the boardroom." Defendant Kazemipour represents that his companies have "proven to be a viable environment to raise venture capital funds as well as to negotiate multi-billion dollar mergers and acquisitions." Defendant Kazemipour represents that he has "US Naval training" which "cultivated his drive, intensity and strategic foresight." Defendant Kazemipour further represents that he is "currently advising companies focusing on artificial

intelligence markup language for applications in AI, as well as big data/analytics for healthtech, fintech, IOT, and Autonomous Driving solutions."[12]

12.     Defendant Kazemipour has a significant online presence, including on LinkedIn and other social media sites, where he holds himself out as a successful venture investor and as an international jet-setter. Defendant Kazemipour has styled himself as the "Tinder Swindler" of investment fraud based on his habitual false representations, parasitic behavior, and theft from Plaintiff.

13.     In or around the summer of 2018, Plaintiff met Defendant Kazemipour at an event at a rooftop bar in San Diego, California. Plaintiff and Defendant Kazemipour had mutual interests in starting companies and investing in technology companies, and Defendant Kazemipour represented to Plaintiff that he had many connections to startup technology companies for early investment with large potential returns on investment.

14.     Plaintiff and Defendant Kazemipour fast became friends and started hanging out in San Diego when Defendant Kazemipour was in town allegedly for business. Defendant Kazemipour would stay at Plaintiff's house when he came to San Diego, which over time became more and more frequent.

15.     In or around January 2019, Plaintiff discussed with Defendant Kazemipour ideas for the development of two software applications, Jojo and RentMyStuff ("RMS" or "LYS" or "LMS").

16.     Defendant Kazemipour indicated an interest in helping to develop these applications, and stated that he had a team in Colombia that had done work for him in the past and could develop the applications cheaper than could be done in the United States.

17.     The Jojo application in development involves patient referrals to medical and dental practices. Defendant Kazemipour further represented to Plaintiff

---

[1] https://www.karmainternational.com/reza-kazemipour
[2] https://www.blacklabsports.com/team

that he had attended dental school and practiced as a dentist for one year before changing professions. Defendant Kazemipour stated that he still had contacts in the dental field, and would reach out to garner interest in using the application and/or investing money in the application. Plaintiff relied upon this representation in allowing Defendant Kazemipour to be involved in the application development and investment in the same.

18.    On information and belief, Defendant Kazemipour did not attend dental school and did not practice as a dentist for a year as represented.

19.    On March 5, 2019, Defendant Kazemipour sent to Plaintiff a cost estimate from the team in Colombia, UseIt, purportedly to develop the applications.

20.    In or around April 2019, Defendant Kazemipour asked Plaintiff if Plaintiff knew people who might be interested in becoming investors and putting money into the applications.

21.    At the request of Defendant Kazemipour and in furtherance of investing money into startup companies as presented by Defendant Kazemipour, Plaintiff utilized an open a bank account at Wells Fargo in the name of R2 Ventures, Inc. and added Defendant Kazemipour as an account user for ease in investment in these startup companies (the "Joint Investment Account").

22.    At the request of Defendant Kazemipour and in furtherance of paying for expenses related to the investment of money into startup companies, Plaintiff opened an American Express credit card account in the name of R2 Ventures and added Defendant Kazemipour as an account user for ease in the payment of expenses related to the investments in these startup companies (the "Joint Amex Account").

23.    On or about July 26, 2019, Defendant Kazemipour sent to Plaintiff via email another schedule for purported payments to develop the applications, purportedly from the Colombian developers.

24.    Throughout 2020 and 2021, Defendant Kazemipour utilized his access to the Joint Investment Account and the Joint Amex Account to fund his lavish

lifestyle: paying for trips to Dubai, United Arab Emirates, the Maldives, Mexico, among others, and back; paying for various luxury hotels and luxury cars; and paying his own personal expenses at places like Louis Vuitton, Yves Saint Laurent, AT&T, Apple, Neiman Marcus, Nordstrom, Safeway, Lululemon, North Face, REI, Soul Cycle, etc., and expenses for the benefit of his family, including his daughter's tuition at the University of Colorado – Boulder, among many other expenses; all at the expense of Plaintiff, who hoped to use Defendant Kazemipour's purported status as a successful venture investor to help further Plaintiff's own personal investments.

25.     The trust Plaintiff placed in Defendant Kazemipour would prove to be misplaced, as Defendant Kazemipour spent commingled funds lavishly and unabated after specifically (and falsely) representing to Plaintiff that funds invested by Plaintiff were to be used for the benefit of the partnership.

26.     On information and belief, none of the funds that have been deposited into the Joint Investment Account by Plaintiff have been used for investment into companies and businesses as agreed upon between Plaintiff and Defendant Kazemipour (and falsely represented to Plaintiff by Defendant Kazemipour thereby inducing Plaintiff to deposit funds into the Joint Investment Account).

27.     On information and belief, Defendant Kazemipour has never deposited any money into the Joint Investment Account to invest in companies as he has represented he would, nor has he utilized his own funds to pay the personal expenses he incurred on the Joint Amex Account.

28.     Defendant Kazemipour misappropriated and converted the funds in the Joint Investment Account based on a series of lies, and for personal profit at the expense of Plaintiff. Plaintiff relied on Defendant Kazemipour's false representations that Defendant Kazemipour would invest the funds into the companies agreed upon. Plaintiff relied on Defendant Kazemipour's false representations that the Joint Amex Account would be used for necessary and reasonable business expenses in furtherance of the investment partnership. Defendant Kazemipour's purchase of

Louis Vuitton luxury items and travels to exotic places like the Maldives for pleasure, where no investment opportunities took place, constituted fraud and far exceeded all agreed upon use of investment funds.

## DEFENDANT KAZEMIPOUR ENGAGES IN A CAMPAIGN OF DECEIT AND FRAUD FOR HIS OWN BENEFIT

29.   Influenced by Defendant Kazemipour's purported connection to startup companies and in furtherance of investing into those companies, Plaintiff allowed a friend of his to invest $100,000.00 into the Joint Investment Account on or about July 29, 2019 based on Defendant Kazemipour's false representations that the funds would be used for investment purposes.

30.   That month, Defendant Kazemipour began utilizing Joint Investment Account funds for his own personal use, purchasing tickets on Southwest Airlines for travel.

31.   In August 2019, Defendant Kazemipour opened the spigot on this account, utilizing the Joint Investment Account funds for personal travel to Palm Springs, buying plane tickets on Alaska Air, dining at high-end restaurants, and for personal use at Costco Superstore.

32.   On or about September 6, 2019, Defendant Kazemipour utilized Joint Investment Account funds to make a $4,260.00 payment on the Joint Amex Account, which was also being utilized for Defendant Kazemipour's personal expenses and travel. This use of the Joint Amex Account was not agreed to by Plaintiff.

33.   On or about September 16, 2019, Plaintiff caused $25,000.00 to be deposited into the Joint Investment Account, a first installment on funds to be utilized in the development of two software applications, Jojo and RentMyStuff (hereinafter referred to as the "Apps") based on Defendant Kazemipour's false representations that this money would be invested into Jojo and RentMyStuff.

34.   Defendant Kazemipour falsely represented to Plaintiff that he had software code developers in Colombia who would develop code for the Apps at a

much lesser expense than they could find for developers in the United States. Plaintiff relied on this false representation to his detriment by investing more money because of Defendant Kazemipour's lie.

35.    On or about September 16, 2019 and September 17, 2019, Defendant Kazemipour utilized Joint Investment Account funds again to pay on the Joint Amex Account in the amounts of $50,000.00 and $2,445.04, respectively.

36.    On or about October 2, 2019, at the request of Defendant Kazemipour, Plaintiff deposited $10,000.00 into the Joint Investment Account for further development of the Apps.

37.    On or about October 21, 2019, Defendant Kazemipour utilized Joint Investment Account funds to pay the Joint Amex Account in the amount of $4,592.69. At no point, did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

38.    On or about November 1, 2019, Plaintiff deposited an additional $10,000.00 into the Joint Investment account for further development of the Apps.

39.    On or about November 13, 2019, Defendant Kazemipour utilized Joint Investment Account funds to pay the Joint Amex Account in the amount of $1,494.00. At no point, did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

40.    For the remainder of November 2019, Defendant Kazemipour utilized Joint Investment Account funds for multiple purchases in Abu Dhabi which were not authorized by Plaintiff or Defendant 1792GP. At no point, did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

41.    On or about December 2, 2019, Plaintiff deposited $7,445.00 into the Joint Investment Account for payment of expenses related to the Apps and/or

purported investments.

42.     On or about December 4, 2019, Defendant Kazemipour utilized Joint Investment Account funds to pay the Joint Amex Account in the amount of $12,222.50. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

43.     On or about December 23, 2019, Defendant Kazemipour utilized Joint Investment Account funds to pay the Joint Amex Account in the amount of $5,954.76. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

44.     In January 2020, Defendant Kazemipour continued his lavish spending in Abu Dhabi, utilizing approximately $3,000.00 from the Joint Investment Account for personal use. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

45.     On or about January 17, 2020, Defendant Kazemipour utilized Joint Investment Account funds to pay the Joint Amex Account in the amount of $12,915.05. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

46.     In February 2020, Defendant Kazemipour continued his lavish spending in Abu Dhabi, utilizing thousands of dollars from the Joint Investment Account and from the Joint Amex Account.

47.     On or about February 12, 2020, Defendant Kazemipour utilized Joint Investment Account funds to pay the Joint Amex Account in the amount of $7,306.62. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment

1    purposes.

2         48.    On or about February 25, 2020, Defendant Kazemipour withdrew

3    $6,000.00 from the Joint Investment Account funds when he visited a Wells Fargo

4    banking branch. At no point did Defendant Kazemipour seek authorization for use of

5    these funds or provide proof that these funds were used for agreed upon investment

6    purposes.

7         49.    On or about March 4, 2020, Defendant Kazemipour withdrew $1,000.00

8    at a Wells Fargo banking branch in Los Altos, CA. At no point did Defendant

9    Kazemipour seek authorization for use of these funds or provide proof that these

10   funds were used for agreed upon investment purposes.

11        50.    On or about March 4, 2020, Defendant Kazemipour utilized Joint

12   Investment Account funds to pay the Joint Amex Account in the amount of

13   $11,703.33. At no point did Defendant Kazemipour seek authorization for use of

14   these funds or provide proof that these funds were used for agreed upon investment

15   purposes.

16        51.    On or about March 6, 2020, Plaintiff transferred $50,000.00 into the

17   Joint Investment Account because of the false representations of Defendant

18   Kazemipour that these funds would be dedicated towards the further development of

19   the Apps. This was another lie from Defendant Kazemipour.

20        52.    On or about April 2, 2020, Defendant Kazemipour made two

21   withdrawals from the Joint Investment Account when he visited a Wells Fargo

22   banking branch in the amounts of $2,000.00 and $3,000.00. At no point did

23   Defendant Kazemipour seek authorization for use of these funds or provide proof

24   that these funds were used for agreed upon investment purposes.

25        53.    On or about April 6, 2020, Defendant Kazemipour utilized Joint

26   Investment Account funds to pay the Joint Amex Account in the amount of

27   $12,739.03. At no point did Defendant Kazemipour seek authorization for use of

28   these funds or provide proof that these funds were used for agreed upon investment

1  purposes.

2      54.    On or about May 20, 2020, Defendant Kazemipour utilized Joint

3  Investment Account funds to pay the Joint Amex Account in the amount of

4  $8,987.22. At no point did Defendant Kazemipour seek authorization for use of these

5  funds or provide proof that these funds were used for agreed upon investment

6  purposes.

7      55.    Defendant Kazemipour lied to Plaintiff again on or about June 3, 2020,

8  and induced him to deposit another $50,000 into the Joint Investment Account.

9  Defendant Kazemipour falsely represented that these funds would be an investment

10  that would pay off within a year. Defendant Kazemipour falsely promised Plaintiff

11  that he would send detailed paperwork on the utilization of such funds. Defendant

12  Kazemipour never provided any documentation that these funds were used for agreed

13  upon investment purposes.

14      56.    On or about June 4, 2020, Plaintiff transferred $50,000.00 from his

15  personal business account into the Joint Investment Account to be used for potential

16  investments into startup companies Defendant Kazemipour had presented to Plaintiff

17  the previous night. This representation constituted another lie promulgated by

18  Defendant Kazemipour inducing Plaintiff to invest additional funds. These funds

19  were unlawfully used by Defendant Kazemipour for his personal profit and to the

20  detriment of Plaintiff.

21      57.    On or about June 17, 2020, Defendant Kazemipour utilized Joint

22  Investment Account funds to pay the Joint Amex Account in the amount of

23  $6,511.66. At no point did Defendant Kazemipour seek authorization for use of these

24  funds or provide proof that these funds were used for agreed upon investment

25  purposes.

26      58.    On or about June 25, 2020, Plaintiff made two transfers into the Joint

27  Investment Account in the amount of $22,000.00 and $26,763.00, respectively, as

28  induced by Defendant Kazemipour for further use in investment into various startup

companies. Plaintiff made the two transfers based on the false representations from Defendant Kazemipour that these funds would be invested. These funds were never invested into the agreed upon companies. Instead, these funds were used by Defendant Kazemipour for unauthorized personal expenses.

59.   On or about June 26, 2020, Defendant Kazemipour initiated a wire transfer from the Joint Investment Account into a JP Morgan Chase account in the amount of $50,000.00 with reference to investment into a company called Stemonix, Inc. Defendant Kazemipour never invested this money with Stemonix, and again lied to Plaintiff in order to procure funds from Plaintiff.

60.   On or about July 3, 2020, Defendant Kazemipour initiated a wire transfer from the Joint Investment Account to a Citibank, N.A. account with reference to Defendant 1792 Partners in the amount of $10,000.00 from the Investment Account via wire transfer to a Citibank, N.A. account. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

61.   On or about July 6, 2020, Defendant Kazemipour withdrew $36,000.00 from the Joint Investment Account via an in-branch/store withdrawal. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

62.   On or about July 17, 2020, Defendant Kazemipour utilized Joint Investment Account funds to pay the Joint Amex Account in the amount of $5,621.67. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

63.   On or about August 12, 2020, Defendant Kazemipour initiated a Business to Business ACH Debit from the Joint Investment Account to the Joint Amex Account in the amount of $21,448.97. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used

for agreed upon investment purposes.

64.     In or around early November 2020, Defendant Kazemipour presented to Plaintiff Stemonix, Inc. as a possible investment. Defendant Kazemipour took Plaintiff to the company's campus, where Plaintiff met a person who purportedly worked for Stemonix. Defendant Kazemipour falsely represented to Plaintiff that Stemonix's technology was disruptive and recommended investment. Defendant Kazemipour stated that Plaintiff should put funds into the Joint Investment Account and that Defendant Kazemipour would invest that money into Stemonix. Defendant Kazemipour never invested the money into Stemonix.

65.     As a result of Defendant Kazemipour's inducement, on or about November 24, 2020, Plaintiff deposited $85,000.00 into the Joint Investment Account which was to be used pursuant to a the verbal agreement with Defendant Kazemipour, to invest in Stemonix, Inc. The investment was to be further memorialized in a written partnership agreement.

66.     Throughout November 2020, Defendant Kazemipour utilized Joint Investment Account funds and the Joint Amex Account for multiple purchases around the world and on the internet; but none of these purchases were agreed to by Plaintiff and Defendant Kazemipour.

67.     Throughout December 2020, Defendant Kazemipour utilized Joint Investment Account funds and the Joint Amex Account for multiple purchases in Abu Dhabi, Texas, Colorado, San Diego, the San Francisco Bay Area, Los Angeles, Dubai, and on the internet, all of which had nothing to do with investing in the agreed upon companies. Rather, Defendant Kazemipour frivolously incurred charges for personal use.

68.     On or about December 18, 2020, Defendant Kazemipour utilized Joint Investment Account funds to pay the Joint Amex Account in the amount of $54,235.71. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

purposes.

69.     On or about January 1, 2021, Defendant Kazemipour presented Plaintiff with the "Limited Partnership Agreement of 1792 Partners Inc." (See Exhibit A; hereinafter referred to as the "Stemonix 1792 LP Agreement"), which purported to create a Delaware limited partnership between and among Defendant Kazemipour, Defendant 1792, and Plaintiff (the "Stemonix 1792 LP").

70.     The purpose stated for Stemonix 1792 LP was to "engage in any lawful act or activity for which limited partnerships may now or hereafter be organized under the laws of the State of Delaware."

71.     Defendant Kazemipour represented to Plaintiff that Stemonix 1792 LP was being formed to invest their joint venture funds into Stemonix.

72.     The Stemonix 1792 LP Agreement stated that Defendant 1792 Partners Inc. GP would be the general partner and Plaintiff would be an "Organizational Limited Partner." The Stemonix 1792 LP Agreement further stated that the initial capital contributions would be $1,200,000 from Defendant 1792 Partners Inc. GP and $85,000 from Plaintiff.

73.     The Stemonix 1792 LP Agreement stated that the "term of the Partnership shall commence on the date of the filing of the Certificate of Limited Partnership in the Office of the Secretary of State of the State of Delaware…"

74.     Defendant Kazemipour led Plaintiff to believe that Defendant Kazemipour or Defendant 1792 would file the Certificate of Limited Partnership with the Office of the Secretary of State of the State of Delaware.

75.     Defendant Kazemipour and/or Defendant 1792 never filed the Certificate of Limited Partnership in the Office of the Secretary of State of the State of Delaware pursuant to the Stemonix 1792 LP Agreement.

76.     On information and belief, neither Defendant 1792 Partners Inc. GP, Defendant Kazemipour, nor Defendant 1792 ever invested the Joint Investment Account money, or any other funds into Stemonix.

77.     Defendant Kazemipour has nonetheless utilized the funds deposited into the Joint Investment Account for his own personal use, including, but not limited to, travel and accommodations to and from foreign countries.

78.     On or about January 4, 2021, Defendant Kazemipour utilized the Joint Amex Account to pay $6,135.49 to the Colorado University Bursar, purportedly for his daughter's tuition at the university. At no point did Plaintiff authorize this payment from the Joint Investment Account or Joint Amex Account.

79.     On or about January 8, 2021, Plaintiff sent Defendant Kazemipour a text message requesting a note for the Stemonix investment but never received a response from Defendant Kazemipour, or any proof that agreed upon investments were made to Stemonix. Rather, Defendant Kazemipour laundered the funds for personal use.

80.     On January 20, 2021, Plaintiff told Defendant Kazemipour not to utilize the Joint Investment Account or Joint Amex Account funds for his own personal use as it would be hard to explain on their taxes, which Defendant Kazemipour represented he would file for R2 Ventures, Inc.

81.     On or about January 20, 2021, Defendant Kazemipour utilized Joint Investment Account funds to pay the Joint Amex Account in the amount of $17,797.76. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

82.     In February 2021, Defendant Kazemipour continued to utilize Joint Investment Account funds for his personal benefit in Abu Dhabi, but surreptitiously hid this usage from Plaintiff and did so on the false premise that the funds from the Joint Investment Account were being used for agreed upon investment purposes.

83.     On or about February 17, 2021, Defendant Kazemipour utilized Joint Investment Account funds to pay the Joint Amex Account in the amount of $10,000.00. At no point, did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment

purposes.

84.    On or about March 17, 2021, Defendant Kazemipour utilized the Joint Amex Account to pay $25,563.59 to the Colorado University Bursar, purportedly for his daughter's tuition at the university. At no point did Plaintiff authorize this payment from the Joint Investment Account or Joint Amex Account.

85.    On or about April 2021, Plaintiff sent Defendant Kazemipour a text regarding repeated calls from American Express due to non-payment on the account. Defendant Kazemipour responded that he would take care of it.

86.    On May 5, 2021, Defendant Kazemipour stated to Plaintiff that he needed to borrow money for something and asked Plaintiff for $20,000.00. Defendant Kazemipour stated that since Plaintiff allegedly owed him money, he requested a lump sum payment from Plaintiff. This was a completely false statement, as Defendant Kazemipour lied to Plaintiff to procure the $20,000.00.

87.    On or about May 5, 2021, Plaintiff deposited $25,000.00 into the Joint Investment Account for further investment into the Apps and the $20,000.00 loan to Defendant Kazemipour.

88.    Throughout May 2021, Defendant Kazemipour utilized Joint Investment Account funds and the Joint Amex Account to pay for meals at high-end restaurants in the Los Angeles area and in Los Altos, CA, in addition to $567.48 at a Costco in Colorado, among many other unauthorized purchases, which were not for investment purposes.

89.    On or about May 7, 2021, Defendant Kazemipour initiated a Business to Business ACH Debit from the Joint Investment Account to the Joint Amex Account in the amount of $5,674.00. At no point did Plaintiff authorize this payment from the Joint Investment Account or Joint Amex Account.

90.    On or about May 18, 2021, Defendant Kazemipour made a withdrawal from the Joint Investment Account in the amount of $13,010.00. At no point, did Defendant Kazemipour seek authorization for use of these funds or provide proof

that these funds were used for agreed upon investment purposes.

91.    On the same day, Plaintiff discussed with Defendant Kazemipour the numerous delays with the development of the Apps, and Defendant Kazemipour's lack of involvement and disinterest in the process. Plaintiff sent a follow up email to Defendant Kazemipour and the team in Colombia regarding Plaintiff's concerns with the lack of progress or any evidence that the investment funds had actually been invested in the companies that Plaintiff and Defendant Kazemipour agreed to invest in.

92.    In or around June 2021, Defendant Kazemipour represented to Plaintiff that additional funds were needed for the development of the Apps. Plaintiff relied on this false statement and deposited additional funds into the Joint Investment Account.

93.    On or about June 3, 2021, Plaintiff deposited $25,000.00 into the Joint Investment Account from his business checking account for the purpose of investment into the Apps, and for no other purpose.

94.    On or about June 7, 2021, Defendant Kazemipour made a series of withdrawals in the amounts of $1,003.00, $19,010.00, and $3,000.00. At no point, did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes. Defendant Kazemipour made additional withdrawals on June 14, June 21, June 25, 2021 while in Dubai, all in the amount of $571.75. Defendant Kazemipour made an additional withdrawal in the amount of $285.88 on June 25, 2021 also while in Dubai. None of these funds were utilized for agreed upon investment purposes.

95.    Throughout the month of June 2021, Defendant Kazemipour utilized Joint Investment Account funds and the Joint Amex Account for purchases throughout the world, including, but not limited to, for restaurants and hotels in Dubai. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment

purposes.

96.    On or about June 29, 2021, Defendant Kazemipour initiated payment of the Joint Amex Account in the amount of $5,674.00, but the payment was returned due to insufficient funds in the Joint Investment Account. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

97.    On or about July 1, 2021 and July 6, 2021, Defendant Kazemipour initiated payment of the Joint Amex Account both in the amount of $5,674.00, but the payments were returned due to insufficient funds. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

98.    On or about July 6, 2021, Defendant Kazemipour presented Plaintiff with an opportunity to invest $350,000.00 in a company called Helm.ai, Inc. ("Helm"). Defendant Kazemipour represented that the company was working on driverless cars and was incredibly promising. Defendant Kazemipour noted that he had put in $600,000 of his own money into Helm and asked Plaintiff if he wanted to invest. Noting Defendant Kazemipour's purported expertise in AI and self-driving technology, Plaintiff agreed to invest based on Defendant Kazemipour's false promises. Plaintiff put the money into the Joint Investment Account with the intent that Defendant Kazemipour would invest the money into Helm, and for no other purpose.

99.    On or about July 6, 2021, Plaintiff deposited $220,000.00 into the Joint Investment Account, with $20,000.00 to be used as a personal loan to Defendant Kazemipour, and $200,000.00 to be used by Defendant 1792GP to invest in Helm.

100.    Throughout the month of July 2021, Defendant Kazemipour utilized the Joint Investment Account funds and the Joint Amex Account for various personal purchases, including in Los Altos, California; Coronado, California; Boulder, Colorado; San Diego, California; Costa Mesa, California; and Santa Ana, California.

None of these fraudulent purchases were in furtherance of the agreed upon investment purposes.

101.  On or about July 8, 2021, Defendant Kazemipour initiated an ACH Debit payment from the Joint Investment Account to the Joint Amex Account in the amount of $5,674.00. At no point did Defendant Kazemipour seek authorization for use of use of these funds or provide proof that these funds were used for agreed upon investment purposes.

102.  On or about July 19, 2021, Defendant Kazemipour made two withdrawals from the Joint Investment Account in the amounts of $75,000.00 and $8,400.00.  At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

103.  On or about July 22, 2021, Plaintiff requested a formal note from Defendant Kazemipour for the previous investments, and requested a specific note for the Helm investment. Defendant Kazemipour failed to provide the requested documentation in order to conceal his fraudulent conduct.

104.  On or about July 28, 2021, Defendant Kazemipour initiated an ACH Debit payment from the Joint Investment Account to the Joint Amex Account in the amount of $5,674.00. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

105.  On or about August 3, 2021, Defendant Kazemipour made a withdrawal from the Joint Investment Account in the amount of $50,000.00. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

106.  Throughout August 2021, Defendant Kazemipour utilized the Joint Investment Account funds and the Joint Amex Account for various personal expenses, including in or around the Los Angeles, California area. At no point, did

Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

107.   On or about August 13, 2021, after Plaintiff's numerous complaints that the Apps were going nowhere, Defendant Kazemipour introduced Plaintiff to a company called Thinglogix, a project management team. Thinglogix was never engaged for work by Plaintiff or Defendant Kazemipour.

108.   On or about August 27, 2021, Defendant Kazemipour made a withdrawal from the Joint Investment Account in the amount of $3,000.00.  At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

109.   On or about August 30, 2021, Defendant Kazemipour initiated an ACH Debit payment from the Joint Investment Account to the Joint Amex Account in the amount of $5,674.00. At no point, did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

110.   In or around August 2021, Defendant Kazemipour falsely represented to Plaintiff that Helm had further novel AI technology for cars. Defendant Kazemipour induced Plaintiff to invest more money into Helm, based on this false representation to the tune of $150,000.00. Plaintiff agreed to put the additional funds into the Joint Investment Account because of Defendant Kazemipour's false representation.

111.   On or about September 7, 2021, Defendant Kazemipour made an ATM withdrawal from the Joint Investment Account in the amount of $1,006.99. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

112.   On or about September 8, 2021, Plaintiff received investment paperwork for the Helm investment from Defendant Kazemipour. Plaintiff requested that the paperwork specifically state that the funds would be used to invest in Helm.

113.   Throughout the month of September 2021, Defendant Kazemipour utilized the Joint Investment Account funds and the Joint Amex Account for various unauthorized personal purchases, including, but not limited to, meals, flights and hotels in Las Vegas, Los Angeles, West Hollywood, Dubai, Amsterdam, Abu Dhabi, Nice, and Monaco.

114.   On or about September 28, 2021, Defendant Kazemipour initiated an ACH Debit payment from the Joint Investment Account to the Joint Amex Account in the amount of $5,674.00. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

115.   On or about October 1, 2021, Defendant Kazemipour withdrew $25,000.00 from the Joint Investment Account via wire transfer to a Citibank, N.A. account with a reference to Defendant 1792 Partners. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

116.   Throughout the month of October 2021, Defendant Kazemipour continued to utilize the Joint Investment Account funds and Joint Amex Account for various purchases, including, but not limited to, meals, flights and hotels in Amsterdam, Dubai, and Abu Dhabi. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

117.   On or about October 15, 2021, Plaintiff confronted Defendant Kazemipour regarding Defendant Kazemipour's dishonest statements concerning investment in the Apps, the lack of providing requested (or any) documentation for the investments in the Apps and startup investments, as well as repeated unpaid traffic citations that arrived at Plaintiff's house for Defendant Kazemipour's vehicle.

118.   On or about October 20, 2021, Plaintiff emailed Defendant Kazemipour regarding the lack of documentation and continued use of company funds for

Defendant Kazemipour's personal expenses.

119.   On or about October 28, 2021, Defendant Kazemipour initiated an ACH Debit payment from the Joint Investment Account to the Joint Amex Account in the amount of $5,674.00. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

120.   Throughout the month of November 2021, Defendant Kazemipour continued to utilize the Joint Investment Account funds and the Joint Amex Account for various purchases, including but not limited to meals, flights and hotels in and around Los Angeles and the San Francisco Bay Area. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

121.   On or about November 19, 2021, Defendant Kazemipour contacted Plaintiff through telephone. After an extensive talk, Defendant Kazemipour falsely stated that Helm is "going public soon" and that Plaintiff was investing heavily into Helm. Defendant Kazemipour asked Plaintiff if he wanted a "quick return" and suggested that Plaintiff invest more money.

122.   On or about November 19, 2021, based on Kazmipour's false representations, Plaintiff deposited $150,000.00 into the Joint Investment Account as a part of the $350,000.00 purportedly to be used by Defendant 1792GP to invest in Helm.

123.   On or about November 19, 2021, Defendant Kazemipour presented Plaintiff with the Limited Partnership Agreement of Defendant 1792 Partners, Inc. (See Exhibit B; hereinafter referred to as the "Helm LP Agreement"), which purported to create a Delaware limited partnership between and among Plaintiff, Defendant Kazemipour, and Defendant 1792 called 1792 Partners Inc. GP.

124.   The purpose stated in the Helm LP Agreement was to "engage in any lawful act or activity for which limited partnerships may now or hereafter be

organized under the laws of the State of Delaware."

125.   The Helm LP Agreement further stated that the specific "Deal" for the partnership was to invest $350,000.00 in a company called Helm.

126.   The Helm LP Agreement stated that Defendant 1792GP would be the general partner and Plaintiff would be an "Organizational Limited Partner." The Helm LP Agreement further stated that the initial capital contributions would be $600,000 from Defendant 1792 Partners Inc. GP and $350,000 from Plaintiff.

127.   Defendant Kazemipour signed the Helm LP Agreement as Managing Director of 1792 Partners Inc. GP.

128.   Despite Defendant Kazemipour, Defendant 1792 and Defendant 1792GP's representations, the Helm LP Agreement was never filed in the State of Delaware, Defendant 1792 Partners Inc. GP was never formed as a limited partnership in Delaware, and the partnership never invested $350,000.00 from the Joint Investment Account in Helm. The entire agreement proved to be a sham and based on fraud.

129.   On or about November 29, 2021, Defendant Kazemipour initiated an ACH Debit payment from the Joint Investment Account to the Joint Amex Account in the amount of $5,674.00. At no point, did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

130.   On or about December 1, 2021, Defendant Kazemipour made two withdrawals from the Joint Investment Account in the amounts of $50,010.00 and $5,000.00. At no point, did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

131.   Throughout December 2021, Defendant Kazemipour continued to utilize the Joint Investment Account funds and Joint Amex Account for various unauthorized personal purchases, including, but not limited to, meals, flights and

hotels in and around Los Angeles and Dubai. Additionally, Defendant Kazemipour made an ATM Withdrawal in Dubai in the amount of $857.69, and purchased Apple Cash in the amount of $600. At no point, did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

132.   In or around December 2021, Plaintiff demanded financials for the various investments, including profit and loss statements, cash flow statements and detailed financials for the Apps, Stemonix and Helm. Plaintiff also confronted Defendant Kazemipour again regarding the personal use of funds and over drafting of the Joint Investment Account. Tellingly, Defendant Kazemipour never provided any audited or official financials or any of the requested documents.

133.   On or about December 29 and December 31, 2021, and again on or about January 4, 2022 and January 31, 2022, Defendant Kazemipour attempted to initiate an ACH Debit payment from the Joint Investment Account to the Joint Amex Account, each time in the amount of $5,674.00. Each payment was returned due to insufficient funds. At no point did Defendant Kazemipour seek authorization for use of these funds or provide proof that these funds were used for agreed upon investment purposes.

134.   On or about January 3, 2022, Plaintiff again requested financials for the investments from Defendant Kazemipour. No response was received.

135.   On or about January 13, 2022, Plaintiff emailed Defendant Kazemipour regarding the overdrafts, international fees, and Joint Amex Account charges.

136.   On or about January 25, 2022, Plaintiff confronted Defendant Kazemipour regarding the latest of many unpaid traffic citations, which were sent to Plaintiff's house.

137.   On or about January 28, 2022, Plaintiff confronted Defendant Kazemipour via email again regarding the overdraft notices and financial irregularities.

138.   In or around late January 2022, Plaintiff contacted the CEO of Helm directly and spoke with him on the phone. The CEO of Helm mentioned that he knew of Defendant Kazemipour, but that he only accepted institutional investors and that no other investments had been made in the company. He denied any financial investment from Defendant Kazemipour or 1792 Partners, Inc.. This confirmed Defendant Kazemipour's fraudulent conduct.

139.   On or about February 1, 2022, Plaintiff met Defendant Kazemipour at a restaurant to confront him regarding all of the issues and to demand repayment. Defendant Kazemipour denied any wrongdoing and stated that he had an underlying business plan for all the investments. Defendant Kazemipour promised at that time that he would provide full documentation of all expenses and investments. No such documentation has been produced by Defendant Kazemipour, evidencing further lies from Defendant Kazemipour.

140.   In total, Plaintiff deposited $657,445.00 into the Joint Investment Account based on, what proved to be, the repeated false and fraudulent representations from Defendant Kazemipour and Defendant 1792. Plaintiff's sole intention with investing funds into the Joint Investment Account was to invest those funds into lucrative startup company investments based on Defendant Kazemipour's experience, expertise, purported reputation, statements and conduct.

141.   Plaintiff relied upon Defendant Kazemipour and Defendant 1792 in their representations as successful venture capital investors (a false representation in and of itself), foregoing other investment opportunities and interest on the Joint Investment Account funds for the opportunity to invest with a purportedly successful venture capital investor.

142.   Defendant Kazemipour holds himself out to the startup community as a proven Silicon Valley entrepreneur and Wall Street investor with a decades-long track record. This is a lie.

143.   Defendant Kazemipour, Defendant 1792 and Defendant 1792GP failed

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

to follow through on their promises to invest Plaintiff's money in companies as represented by Defendants, with $0 invested in the Apps nor any of the other investment opportunities presented by Defendants to Plaintiff.

144.    On information and belief, Defendants have failed to file the appropriate filings with the State of Delaware to formalize the partnerships, have failed to pay taxes on the businesses despite representing that they would do so, and have taken Plaintiff's money for their own illicit purposes, in contradiction to the partnership agreements and in violation of multiple laws.

145.    Defendants utilized modes of interstate commerce to carry out the essential parts of their scheme of fraudulent conduct by communicating with Plaintiff through wires and withdrawing funds for improper purposes through wires. Defendant Kazemipour fraudulently used wires through the unlawful enterprise of Defendant 1792. Defendant 1972 had knowledge of Defendant Kazemipour's fraudulent use of wires for Defendant Kazemipour's self-benefit.

146.    Defendant Kazemipour as a purported investment advisor and fiduciary business partner to Plaintiff had a duty to disclose material facts to Plaintiff about the intended use of the transactions from the Joint Investment Account and Joint Amex Account. Defendant Kzeminpour failed to disclose his true intentions and use of both the Joint Investment Account and the Joint Amex Account. Defendant Kazeminpour's true intentions were to deceive Plaintiff and personally benefit from the funds in the Joint Investment Account through luxury purchases and extravagant travel, rather than investing the funds and use of the Joint Amex Account directed to the investment purposes agreed upon by Plaintiff and Defendant Kazemipour.

## FIRST CAUSE OF ACTION

### Breach of Contract

### (Against All Defendants)

147.    Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through 146, inclusive, of his Complaint and by reference thereto

incorporates them herein as though set forth in full.

148.   Plaintiff and Defendants entered into the Stemonix 1792 LP Agreement and the Helm LP Agreement, to carry on a business, specifically, to set up limited partnerships to invest money in Stemonix, Inc. and Helm.ai, Inc., respectively. Copies of the agreements are attached hereto as Exhibits A and B and incorporated herein by reference.

149.   Plaintiff agreed to contribute money to each of the partnerships and Defendants Kazemipour and Defendant 1792 agreed to contribute money to each of the partnerships as well.

150.   Defendants agreed to utilize their connections to various companies in order to invest partnership funds in those companies.

151.   Defendants agreed to file the required documents with various government entities to formalize the partnership agreements.

152.   Plaintiff has performed all conditions, covenants, and promises required to be performed on his part of the partnership agreements in accordance with the terms and conditions of each agreement.

153.   Defendants Kazemipour, Defendant 1792 and Defendant 1792GP breached the agreements by failing to contribute money to the partnerships as stated in the agreements; failing to utilize the funds Plaintiff contributed to the partnerships to invest in the stated investment objective of each partnership; failing to file the required Certificates of Limited Partnership with the State of Delaware as required under the partnership agreements; utilizing partnership funds, Plaintiff's contributions, for their own personal expenses rather than for the partnership purposes; and by converting partnership assets for their own use.

154.   As a direct and proximate result of the Defendants' breaches of the partnership agreements, Plaintiff suffered damage in that he contributed money to the partnership for the purpose of investing those funds in various companies, but Defendants utilized those funds for their own use. Plaintiff also lost profits and

interest that would have been earned by the partnership or individually without investing in the partnerships, and but for defendant's breach, in a sum to be proven at trial.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duties

### (Delaware Revised Uniform Partnership Act sect. 15-404 et seq.)

### (Against All Defendants)

155.   Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through 154, inclusive, of his Complaint and by reference thereto incorporates them herein as though set forth in full.

156.   Under the Delaware Revised Uniform Partnership Act, section 15-404, partners owe the duty of loyalty and duty of care to the partnership and other partners.

157.   Partners have a duty to account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct of the partnership business or affairs or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity.

158.   Partners have a duty to refrain from dealing with the partnership in the conduct of the partnership business or affairs as or on behalf of a party having an interest adverse to the partnership.

159.   Partners have a duty of care to the partnership and the other partners in the conduct of the partnership business or affairs to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

160.   By intentionally converting partnership assets for their own personal use; failing to abide by the terms of the partnership agreements; failing to account to Plaintiff in regard to conduct of partnership business; failing to refrain from taking an adverse interest to Plaintiff in the use of Plaintiff's funds for their own personal use and not the partnerships'; and engaging in grossly negligent, reckless and intentional misconduct by utilizing Plaintiff's and the partnerships' funds for their

own personal use; Defendants Kazemipour, Defendant 1792 and Defendant 1792GP have breached their duties of loyalty and care to the partnerships and to Plaintiff.

161.   As a direct and proximate result of the Defendants' breaches of their duties of loyalty and care to the partnerships and to Plaintiff, Plaintiff suffered damages in that he contributed money to the partnerships' businesses which were converted by Defendants for their own purposes, and Plaintiff also lost profits that would have been earned by the partnership but for Defendants' breach, in a sum to be proven at trial.

## THIRD CAUSE OF ACTION

### Fraud and Deceit

### (Against All Defendants)

162.   Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through 161, inclusive, of his Complaint and by reference thereto incorporates them herein as though set forth in full.

163.   Defendants Kazemipour, Defendant 1792 and Defendant 1792GP promised Plaintiff that they would invest Plaintiff's funds with them in various companies and in the development of software applications.

164.   Defendants Kazemipour and Defendant 1792 opened a bank account and a credit card account for the purpose of operating partnerships for the purpose of investing Plaintiff's and Defendants' funds in various companies and in the development of software applications.

165.   Plaintiff relied upon Defendant Kazemipour and Defendant 1792's purported expertise and experience in the venture capital sphere, and upon Defendant Kazemipour's statements that he would marshal the funds in good faith to invest in various companies and in the development of software applications.

166.   At the time the Defendants made the above referenced promises to Plaintiff, the Defendants had no intention of performing on these promises.

167.   At the time the Defendants made the above referenced promises to

Plaintiff, the Defendants intended to convert Plaintiff's funds for their own benefit and use.

168.   The promises were made by the Defendants with the intent to induce Plaintiff to allow Defendants access to Plaintiff's funds, and to convert Plaintiff's funds for their own benefit and use.

169.   Plaintiff, at the time this promise was made and at the time the Plaintiff took the actions herein alleged, was ignorant of the Defendants' secret and malicious intentions not to perform and justifiably relied upon the Defendants' promises based upon the Defendants' purported expertise and experience in venture capital investing. Plaintiff could not, in the exercise of reasonable diligence, have discovered the Defendants' secret and malicious intention.

170.   In reliance on the promise of the Defendants, Plaintiff deposited money into a joint bank account for use by Plaintiff and Defendants to invest in various startup companies, as directed by Defendants.

171.   If Plaintiff had known of the actual intention of the Defendants, Plaintiff would not have taken such actions.

172.   The Defendants failed to abide by their promises by utilizing Plaintiff's funds placed into the joint bank account for their own personal use, among other actions and/or inactions as stated herein.

173.   As a direct and proximate result of the Defendants' actions and/or inactions and the facts alleged in this complaint, Plaintiff was induced to, and did, contribute money to the partnership which Defendants converted for their own personal use, damaging Plaintiff in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Constructive Fraud

### (Against All Defendants)

174.   Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through 173, inclusive, of his Complaint and by reference thereto

1 | incorporates them herein as though set forth in full.

2 |     175. By virtue of the partnership agreements, the relationship between

3 | Plaintiff and Defendants was fiduciary in nature.

4 |     176. Defendants thereby owed Plaintiff the fiduciary duties of loyalty and

5 | care, and the obligation to conduct the partnership business in good faith and in fair

6 | dealing.

7 |     177. Because Plaintiff's confidence in the Defendants' integrity caused

8 | Plaintiff to entrust the Defendants with the authority to act for the partnership, a

9 | confidential relationship existed at all times herein mentioned between Plaintiff and

10 | the Defendants.

11 |     178. Defendants breached their fiduciary duties to Plaintiff and violated the

12 | relationship of trust and confidence by excluding Plaintiff from his interests in the

13 | partnerships' business and assets and by securing an advantage over Plaintiff by

14 | misleading Plaintiff to his prejudice.

15 |     179. Plaintiff placed confidence in and relied on Defendants until on or about

16 | December 13, 2021, when Plaintiff discovered Defendants' acts committed in breach

17 | of their fiduciary duties. Until that date, Plaintiff had reasonably relied on the

18 | Defendants in view of their relationship as partners under the partnership agreements.

19 |     180. As a direct and proximate result of Defendants' fraud as herein alleged,

20 | Plaintiff has been damaged in an amount to be proven at trial.

21 | **FIFTH CAUSE OF ACTION**

22 | **Intentional Misrepresentation**

23 | **(Against All Defendants)**

24 |     181. Plaintiff repeats and realleges all of the allegations contained in

25 | Paragraphs 1 through 180, inclusive, of his Complaint and by reference thereto

26 | incorporates them herein as though set forth in full.

27 |     182. From approximately July 2019 to December 2021 and ongoing,

28 | Defendants negligently misrepresented to Plaintiff that they would invest Plaintiff's

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 69367067v1

31

**COMPLAINT**

money in various companies and in the development of the Apps; however, each representation that Defendants made was, in fact, false.

183.   Defendants knew at the time they made these representations that Defendants would utilize Plaintiff's funds for their own benefit, despite their representations that they would invest those funds according to their expertise in venture investing.

184.   Plaintiff is informed and believes and thereon alleges, that Defendants fraudulently induced Plaintiff to open joint bank and credit card accounts with Defendants in order to steal funds from Plaintiff.

185.   Defendants represented to Plaintiff that they had connections with various startup companies and would invest Plaintiff's funds along with their own with the intent to induce Plaintiff to allow Defendants access to Plaintiff's funds with the intent to defraud and deceive Plaintiff, and for the express purpose of obtaining a secret profit from Plaintiff in an amount exceeding the jurisdictional limits of this Court.

186.   Plaintiff, in reliance on Defendants' representations, allowed Defendants access to joint bank and credit card accounts, and deposited funds into the account for use in investing in companies.

187.   If it had not been for the representations by Defendants and if Plaintiff had known the true facts, Plaintiff would not have allowed Defendants access to his accounts and money.

188.   By reason of the fraud and deceit of Defendants, and each of them, Plaintiff was damaged in an amount exceeding the jurisdictional limits of this Court.

189.   The aforementioned conduct of the Defendant was an intentional misrepresentation, deceit, or concealment of a material fact known to Defendants with the intention on the part of the Defendants of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff's

rights, so as to justify an award of exemplary and punitive damages in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION

### Conversion

### (Against All Defendants)

190.   Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through 189, inclusive, of his Complaint and by reference thereto incorporates them herein as though set forth in full.

191.   Defendants intentionally misrepresented that they were experienced venture capital investors and would invest Plaintiff's funds in startup companies that Defendants believed to be worthy of investment based upon their expertise in venture capital investing.

192.   Plaintiff is informed and believes and thereon alleges, that Defendants made these representations fraudulently for the purpose of gaining access to Plaintiff's considerable funds.

193.   In reliance on Defendants' misrepresentations, Plaintiff transferred funds totaling in excess of amount of $650,000.00 to a joint bank account, which were then utilized by Defendants for their own personal use.

194.   Had Plaintiff known the actual facts, Plaintiff would not have taken such action. Plaintiff's reliance on Defendants' misrepresentations were justified because Plaintiff believed Defendants in good faith.

195.   As a proximate result of the fraudulent conduct of the Defendants as herein alleged, Plaintiff is informed and believes, and based thereon alleges that approximately $650,000.00 of the monies transferred to Defendants was fraudulently used for Defendants' own personal use.

196.   Defendants took the property described above from Plaintiff's possession and converted the same to Defendants' own use. As a result, Plaintiff has been damaged in an amount to be proven at trial, which amount is believed to exceed

the jurisdictional limits of this Court.

197.   At all times mentioned herein, and in particular upon payment of monies to Defendants, Plaintiff was, and still is, the owner of and was, and still is, entitled to possession of the monies fraudulently obtained by Defendants.

198.   Defendants' acts alleged above were willful, wanton, malicious, and oppressive, and were taken with the intent to defraud Plaintiff, and justify the awarding of exemplary and punitive damages to Plaintiff.

### SEVENTH CAUSE OF ACTION

### Unfair Business Practices (Bus. & Prof. Code, §17200 *et seq.*)

### (Against All Defendants)

199.   Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through 198, inclusive, of his Complaint and by reference thereto incorporates them herein as though set forth in full.

200.   Defendants have engaged in unlawful, unfair or fraudulent business acts and practices within the meaning of section 17200 et seq. of the California Business and Professions Code.

201.   Defendants, through their agent, Defendant Kazemipour, negligently misrepresented that they would invest Plaintiff's funds in various companies and in the development of the Apps.

202.   Plaintiff is informed and believes and thereon alleges, that Defendants fraudulently represented that they would invest Plaintiff's funds and induced Plaintiff to allow them access to Plaintiff's bank account and credit card account for the purpose of converting Plaintiff's funds for their own use.

203.   The Defendants' actions or practices offend an established public policy and/or were unlawful, immoral, unethical, oppressive, unscrupulous or substantially injurious to Plaintiff.

204.   Plaintiff is entitled to relief, including full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits, which

may have been obtained by Defendants as a result of such unlawful business acts or practices, and to enjoin Defendants to cease and desist from engaging in the practices described herein, as against Plaintiff and any other member of the public.

205.   As a result of Defendants' unfair and unlawful business practices, Plaintiff has been damaged in an amount to be proven at trial, which amount exceeds the jurisdictional limits of this Court.

## EIGHTH CAUSE OF ACTION

### Accounting

### (Against All Defendants)

206.   Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through 205, inclusive, of his Complaint and by reference thereto incorporates them herein as though set forth in full.

207.   Plaintiff is informed and believes, and based thereon alleges that Defendants have received money as a result of their misconduct, at Plaintiff's expense, and that some or all of such money is rightfully due to Plaintiff.

208.   The amount of money due from Defendants to Plaintiff is unknown to Plaintiff and cannot be ascertained without an accounting of the income and gross profits Defendants have obtained through their illegal conduct as alleged in this Complaint. Therefore, Plaintiff is entitled to a full accounting.

## NINTH CAUSE OF ACTION

### RICO – 18 U.S.C. § 1962(c)

### (Against Defendants Kazemipour and 1792)

209.   Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through 208, inclusive, of his Complaint and by reference thereto incorporates them herein as though set forth in full.

210.   At all times, Defendant Kazemipour directed and operated the affairs of Defendant 1792. Defendant Kazemipour knowingly implemented the decisions for Defendant 1792 and was indispensable in achieving Defendant 1792's goals.

Defendant Kazemipour occupied a position in the chain of command within Defendant 1792 as he was and is the managing director and Chief Executive Officer.

211. At all times, Defendant Kazemipour acted as Defendant 1792's corporate representative and exercised authority to enter into contracts and sign documents on behalf of Defendant 1792.

212. Defendant 1792 is a RICO enterprise because it is a business association.

213. Defendant Kazemipour engaged in a pattern of at least two or more acts of racketeering activity within ten years of each other. The predicate acts engaged in by Defendant Kazemipour are both related and continuous acts of racketeering activity.

214. Defendant Kazemipour engaged in racketeering activity because Defendant Kazemipour engaged in both wire fraud and money laundering.

215. Defendant Kazemipour engaged in wire fraud because Defendant Kazemipour knowingly participated in, devised, and intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, promises, or omitted facts. Defendant Kazemipour issued deceitful statements of half-truths which constituted false and fraudulent representations.

216. Statements made by Defendant Kazemipour and facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, Plaintiff to part with money or property.

217. Defendant Kazemipour acted with the intent to defraud, that is, the intent to deceive and cheat.

218. Defendant Kazemipour used or caused to be used an interstate wire communication to carry out an essential part of the scheme because Defendant Kazemipour used cellular telephone communications, electronic mail, and cellular phone text messages to carry out the essential parts of his scheme.

219.   Defendant Kazemipour had a duty to disclose material facts to Plaintiff about his intended use of the funds deposited into the Joint Investment Account and Joint Amex Account by Plaintiff because Defendant Kazemipour owed Plaintiff a fiduciary duty since Defendant Kazemipour was the managing director of Defendant 1792 and a partner in the limited partnership with Plaintiff. Defendant Kazemipour also acted for the purported benefit of Plaintiff through his informal trusting relationship with Plaintiff, where Defendant Kazemipour was supposed to act for the benefit of Plaintiff and induced Plaintiff to relax the care and vigilance that Plaintiff would ordinarily exercise.

220.   Defendant Kazemipour had a duty to disclose material facts to Plaintiff about his intended use of the Joint Amex Account and paying off the Joint Amex Account with funds deposited by Plaintiff because Defendant Kazemipour owed Plaintiff a fiduciary duty since Defendant Kazemipour was the managing director of Defendant 1792 and a partner in the limited partnership with Plaintiff. Defendant Kazemipour also acted for the purported benefit of Plaintiff through his informal trusting relationship with Plaintiff, where Defendant Kazemipour was supposed to act for the benefit of Plaintiff and induced Plaintiff to relax the care and vigilance that Plaintiff would ordinarily exercise.

221.   It was reasonably foreseeable to Defendant Kazemipour that some wire communication would occur in furtherance of his scheme to defraud Plaintiff, and it was reasonably foreseeable that Defendant Kazemipour would use a wire.

222.   Defendant Kazemipour engaged in money laundering because Defendant Kazemipour knowingly engaged in monetary transactions.

223.   Defendant Kazemipour knew the transactions involved criminally derived property because Defendant Kazemipour himself lied to Plaintiff in order to gain access to funds deposited in the Joint Investment Account. Defendant Kazemipour also knowingly and unlawfully used funds in the Joint Investment Account to pay off his unauthorized expenditures on the Joint Amex Account.

224.   The property involved in these transactions had a value greater than $10,000.00. Defendant Kazemipour unlawfully withdrew more than $10,000.00 from the Joint Investment Account. Defendant Kazemipour unlawfully used funds exceeding $10,000.00 from the Joint Investment Account to pay off unauthorized personal expenses incurred on the Joint Amex Account.

225.   The property was, in fact, derived from Defendant Kazemipour's: 1) unlawful conversion and withdrawals from the Joint Investment Account procured from Defendant Kazemipour's fraudulent representations; and 2) Defendant Kazemipour's unlawful conversion and use of funds from the Joint Investment Account to pay for Defendant Kazemipour's personal expenses incurred by Defendant Kazemipour on the Amex account.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.   For an order requiring Defendants, and each of them, to show cause, if any they have, why they should not be enjoined as set forth above, during the pendency of this action;

2.   For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Defendants from engaging in further acts that violate Business and Professions Code section 17200 et. seq., and from engaging in the sale, transfer, or other disposition or concealment of assets or business documents or records so that the Court will have the ability to grant effective final relief in the form of permanent injunctive relief, rescission, restitution, disgorgement, or other equitable monetary relief;

3.   For trebled damages in an amount to be proven at trial;

4.   For all compensatory damages in an amount to be proven at trial;

5.   For all consequential damages in an amount to be proven at trial;

6.   For reasonable attorney's fees in an amount to be proven at trial;

7.   For Plaintiff's costs incurred in an amount to be proven at trial;

1      8.      For exemplary and punitive damages in an amount to be proven at trial;
2  and

3      9.      For any other and further relief as the court may deem proper.

4

5  DATED:  April 19, 2022              BUCHALTER
                                      A Professional Corporation
6

7                                     By:  /s/Brian C.P. Adkins
8                                          BRIAN C.P. ADKINS
                                           CHARLES F. WHITMAN
9                                          Attorneys for Plaintiff
                                           REZA TIRGARI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2    Under Fed.R.Civ.P.38, Plaintiff demands a trial by jury on all issues so triable.

3

4    DATED:  April 19, 2022                    BUCHALTER
                                               A Professional Corporation
5

6
                                         By:   */s/*Brian C.P. Adkins
7                                              BRIAN C.P. ADKINS
                                               CHARLES F. WHITMAN
8                                              Attorneys for Plaintiff
                                               REZA TIRGARI
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 69367067v1

40

**COMPLAINT**